Marc P. Berger
Lara S. Mehraban
Sheldon L. Pollock
John O. Enright
Dugan Bliss
Philip A. Fortino
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-1014 (Fortino)
Email:  FortinoP@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

----------------------------------------------------------------------:
**SECURITIES AND EXCHANGE COMMISSION,**          :          **19 Civ. _____ (   )**
                                                 :
           Plaintiff,                            :          **ECF CASE**
                                                 :
           - against -                           :          **COMPLAINT**
                                                 :
**BENJAMIN MEKAWY AND**                          :
**ALAN D. SEIDEL,**                              :          **JURY TRIAL**
                                                 :          **DEMANDED**
                                                 :
           Defendants.                           :
                                                 :
----------------------------------------------------------------------:

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Benjamin Mekawy ("Mekawy") and Alan D. Seidel ("Seidel"), alleges as follows:

## SUMMARY OF THE ALLEGATIONS

1. This case is about lying, forgery, and other deceptive conduct by Seidel and Mekawy, while they were employed by broker-dealer Seidel & Co., LLC ("Seidel LLC" or the "Firm"), to mislead its third-party financial operations professional ("FINOP"), the Financial

Industry Regulatory Authority ("FINRA"), and the Commission staff about a key indicator of the Firm's financial health: its net capital position.

2.     Registered broker-dealers like Seidel LLC are required by statute and Commission rules to meet certain minimum net-capital requirements to protect counterparties and customers in the event of problems such as failed trades. Broker-dealers are required to calculate and report their net capital to FINRA on a monthly basis. Commission rules require that a broker-dealer that is not in compliance with the net-capital rules must cease operations. Seidel LLC delegated the preparation of its net-capital calculations, along with other financial functions of the Firm, to its third-party FINOP.

3.     From at least in or about October 2016 through November 2016, Defendants understood that the Firm was operating without the required net capital or, at least, at risk of operating without sufficient net capital. Knowing that the firm would need to cease operations if regulators learned it did not have sufficient net capital, both Seidel and Mekawy engaged in deliberate, deceptive acts to artificially inflate the Firm's net capital that was reported to FINRA.

4.     *First*, Mekawy concealed a six-figure liability for back-rent by deliberately eliminating it from the Firm's general ledger when he knew that the liability had not been satisfied. In addition, Mekawy falsely represented to the Firm's FINOP, who calculated the Firm's net capital and prepared the reports to FINRA, that the liability had been satisfied. *Second*, on a separate occasion, Mekawy prepared and submitted to the FINOP a forged account statement showing that the Firm had more funds on deposit with its clearing firm than it actually did. *Third*, Seidel lied to the Firm's FINOP about a $1 million deposit into one of the Firm's accounts. Seidel falsely represented that the $1 million represented a capital infusion in the Firm, when in fact he knew that it was a loan. Later, in an attempt to cover up his lie to the

FINOP, Seidel also lied to Commission examination staff about the nature of the $1 million deposit.

5. As a result of Mekawy's deceptions, the Firm's FINOP did not take into account the liability for back rent or the accurate amount of funds the Firm had on deposit with its clearing broker. In addition, as a result of Seidel's mischaracterization of the nature of the $1 million transaction, the FINOP counted the $1 million as an asset of the Firm, but did not offset it with a corresponding liability to repay the loan. Consequently, as Mekawy and Seidel intended, certain of the calculations performed by the Firm's FINOP were wrong and the net-capital amounts reported to FINRA for October and November 2016 were falsely and substantially overstated. As a result, the Firm continued operations, presenting risk to counterparties who did not have an accurate picture of the Firm's capitalization.

## **VIOLATIONS**

6. As a result of the foregoing conduct and as alleged further herein, Defendants aided and abetted Seidel LLC's violations of Sections 15(c)(3) and 17(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") and Rules 15c3-1 and 17a-3(a)(19) thereunder.

7. Unless Defendants are permanently restrained and enjoined, they will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint and in acts, practices, transactions, and courses of business of similar type and object.

## **JURISDICTION AND VENUE**

8. The Commission brings this action pursuant to authority conferred by Sections 21(d)(1) and 20(e) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78t(e)] and seeks a final judgment: (a) permanently restraining and enjoining Defendants from engaging in the acts, practices, and courses of business alleged against them herein; (b) imposing civil money

penalties on Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and (c) such other and further relief as the Court may deem just and appropriate.

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10. In connection with the conduct alleged in this Complaint, Defendants have, directly or indirectly, singly or in concert, made use of the mails, or the means or instrumentalities of interstate commerce.

11. Venue is proper in this District under Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and transactions constituting violations alleged in this Complaint occurred in this District. For example, a significant amount of the conduct alleged herein took place at Seidel LLC's offices in New York, New York.

### DEFENDANTS

12. **Seidel**, age 73, resides in Long Beach, New York and was a founder and part-owner of Seidel LLC, who also served as its chief executive officer during the relevant period. Seidel currently holds Series 7, 24, and 63 licenses and was a registered representative continuously from 1988 until March 2019. He was associated with Seidel LLC from 1997 until 2017. Subsequently, and most recently, he was associated with another broker-dealer from June 2018 to March 2019. He is not currently registered with the Commission.

13. **Mekawy**, age 37, resides in Hazlet, New Jersey and was an employee of Seidel LLC from 2010 until the Firm ceased operations in January 2017. Mekawy was hired to work on the Firm's informational technology needs, but his role expanded over time to include assisting in functions relating to the operations of the broker-dealer. He has never held any securities licenses.

**RELEVANT ENTITY**

14. **Seidel LLC** is a New York limited-liability company formed in 1996 with a principal place of business in New York, New York.  It was registered with the Commission as a broker-dealer from approximately 1996 until January 2017, when it withdrew its registration by filing a Form BDW with the Commission.  The Firm was an inter-dealer broker that traded fixed-income securities, earning revenues from mark-ups on the securities it sold.

**FACTS**

*The Net-Capital Rule and Relevant Books and Records Rule*

15. Section 15(c)(3) of the Exchange Act and Rule 15c3-1 [17 CFR § 240.15c3-1] thereunder require broker-dealers generally effecting transactions in securities to "at all times have and maintain net capital" no less than the highest minimum requirement applicable to its business.

16. The net-capital rule requires broker-dealers to maintain different minimum amounts of net capital based on the nature of a Firm's business.  The minimum net-capital requirement is the greater of a fixed-dollar amount specified in the rule or an amount determined by applying one of two financial ratios.  At all relevant times, the minimum fixed dollar amount for Seidel LLC was $100,000, and its required net capital ranged from $100,000 to $106,944.

17. Under Rule 15c3-1(c)(2) [17 CFR § 240.15c3-1(c)(2)], a broker-dealer's "net capital" is defined to mean its "net worth," subject to certain adjustments.  A broker-dealer's net worth, in turn, is calculated by subtracting its liabilities from its assets.

18. The net-capital rule requires a broker-dealer to calculate regularly the amount of net capital the broker-dealer is maintaining.  Generally, a broker-dealer computing net capital calculates its net worth, computed in accordance with generally accepted accounting principles;

deducts the value of certain illiquid assets; and takes deductions from the market value of certain securities it holds. The resulting figure must be above the Firm's required minimum net capital to comply with the net-capital rule.

19. This figure then is reported to FINRA in a monthly Financial and Operational Combined Uniform Single ("FOCUS") Report, which discloses the broker-dealer's financials generally. FOCUS Reports include, among other things, the broker-dealer's balance sheet, income statement, and a statement of any changes in ownership equity.

20. Separately, Section 17(a)(1) of the Exchange Act requires registered broker-dealers to make and keep books and records enumerated in Rule 17a-3. Among the required records is a ledger (or other records) reflecting all the broker-dealer's assets and liabilities.

***Seidel and Mekawy Took Steps to Disguise Seidel LLC's Net-Capital Violations from October 2016 through December 2016***

21. Seidel LLC filed FOCUS reports with FINRA indicating that it had sufficient net capital as of the end of October and November 2016.

22. The Firm's required net capital for October 2016 was $100,000, and it reported net capital of $218,457.

23. For November 2016, the Firm's minimum required net capital was $106,944, and it reported net capital of $796,784.

24. Both of these reports were inaccurate and substantially overstated the Firm's actual net capital. The net-capital figures reported in October and November 2016 were inaccurate as the result of deliberate actions by Defendants to artificially inflate the Firm's assets and/or conceal its liabilities.

### a. Mekawy Hides a Substantial Liability for Back Rent

25. *First*, Mekawy, knowing that the Firm was out of net capital or close to being out of net capital, concealed from the Firm's FINOP a liability for approximately $166,000.00 in unpaid rent.

26. Beginning in or about October 2016, Mekawy, who was responsible for maintaining the Firm's accounting records, eliminated and/or did not record the liability in the Firm's general ledger, even though he knew that the Firm owed the back rent.

27. Moreover, in November 2016, Mekaway falsely represented to the FINOP that the liability had been extinguished by a settlement with the landlord.

28. Concealing this liability resulted in the net capital of the Firm being overstated by approximately $166,000 for the reporting periods ending on October 31, 2016 and November 30, 2016.

### b. Mekawy Alters a Seidel LLC Account Statement

29. *Second*, in or about November 2016, Mekawy doctored an account statement for one of the Firm's cash deposit accounts to make it appear as though the Firm had more funds on deposit than it actually did.

30. Specifically, Mekawy obtained an electronic copy of the Firm's October 31, 2016 deposit account statement from one of the Firm's clearing brokers and, using computer software, changed the Firm's account balance from approximately $150,000 to over $195,000. This change artificially inflated the Firm's assets by more than $45,000.

31. Then, on November 23, 2016, Mekawy sent the altered statement to the Firm's FINOP for use in calculating the Firm's net capital for October 2016. As a result of this conduct, the net capital for October 2016 was overstated by an additional $45,000.

32. Mekawy understood at the time that he forged the statement and submitted it to the FINOP that the Firm was or likely was operating without sufficient net capital.

### c. *Seidel Lies to the FINOP and SEC Staff About a Loan Liability*

33. *Finally*, in December 2016, Seidel inflated the Firm's assets for net-capital purposes by lying to the FINOP about $1 million in loan proceeds received by the Firm.

34. In or about November 2016, Seidel and others at the Firm participated in a meeting with an investor ("Investor-1") to obtain additional financing for the Firm's operations. The additional funds were necessary because certain counterparties had informed Seidel LLC that they would not trade with the Firm unless it could prove that it had greater cash reserves.

35. At the meeting, Investor-1 agreed to loan Seidel LLC $1 million. The transaction subsequently was memorialized with a promissory note that Seidel executed on behalf of the Firm.

36. In the following month, when preparing the Firm's net-capital calculation for November 2016, the FINOP noticed that one of the Firm's clearing deposit accounts had received a $1 million inflow and inquired with Seidel about the sudden apparent increase in assets.

37. Seidel, knowing that the net-capital position of the Firm was precarious, falsely represented to the FINOP that the $1 million in loan proceeds was a capital contribution to the Firm.

38. Seidel understood when he made the false representation that the FINOP would improperly treat the $1 million in loan proceeds as an asset of the Firm for net-capital purposes. Seidel also understood that if this amount were properly characterized as a loan for net-capital

purposes, the FINOP would count the $1 million in cash as an asset, but also reduce the Firm's net capital by the $1 million offsetting liability to repay the loan.

39. As a result of Seidel's deception, the Firm's November 30, 2016 net capital was overstated by at least $1 million.

40. In the aggregate, Seidel and Mekawy's deceptive conduct resulted in a vast overstatement of the Firm's net capital for the October 2016 and November 2016 reporting dates:

| Reporting Date | Minimum Net Capital Required | Net Capital Reported | Less Estimated Amount Overstated | Adjusted Net Capital | Estimated Net-capital Surplus (Deficit) |
|---|---|---|---|---|---|
| 10/30/2016 | $100,000 | $218,457 | ($211,000) | $7,457 | ($92,543) |
| 11/30/2016 | $106,944 | $796,784 | ($1,166,000) | ($369,216) | ($476,160) |

41. Subsequent to the filing of the Firm's November 30, 2016 FOCUS report, Investor-1 demanded the return of the $1 million in loan principal, and the funds were returned on or about December 20, 2016.

42. Without those funds in its clearing account, the Firm could not continue the charade that it was in compliance with the net-capital rule, and it voluntarily withdrew its registration as a broker-dealer on or about January 3, 2017.

### *Seidel Lies to Commission Staff to Cover Up His Misconduct*

43. In or about December 2016, Commission staff in the Office of Compliance Inspections and Examinations ("OCIE") undertook an examination of Seidel LLC to assess its compliance with the federal securities laws, including the net-capital rule.

44. During the examination, Seidel made false statements intended to prevent the OCIE staff from discovering that the Firm's previously reported net capital had been inaccurate.

45. On or about January 3, 2017, Seidel contacted the lead OCIE examiner ("Examiner-1") by telephone. During the call, Seidel falsely stated that the Firm ceased operations on December 30 because one of the Firm's clearing firms, Clearing Firm-1, had withdrawn a $1 million capital infusion it had made in the Firm, leaving the Firm without sufficient net capital. Seidel further stated that Clearing Firm-1 had withdrawn the purported "capital infusion" (which actually had occurred ten days earlier) after conducting due diligence on the Firm. In reality, and as Seidel knew, Clearing Firm-1 withdrew the funds to repay Investor-1's loan.

46. Seidel's statement was false in at least three ways. *First*, it misrepresented that the loan proceeds were a capital infusion. *Second*, it misrepresented the source of the funds as Clearing Firm-1, as opposed to Investor-1. *Third*, it misrepresented the reason why the funds were withdrawn from the account.

47. The following day, Seidel met with Examiner-1 and other members of the OCIE exam staff at the Firm's offices and repeated the statements he had made to Examiner-1 the day before.

48. In addition, at this meeting, Seidel further embellished his false narrative, claiming that Clearing Firm-1 had made the supposed capital infusion because it wanted to continue receiving clearing fees from the Firm.

49. The OCIE staff then sought information about the alleged capital infusion from Clearing Firm-1.

50. On or about January 5, after the OCIE staff had sought information from Clearing Firm-1, Seidel called the OCIE staff and admitted that his earlier statements about the transactions were false.

51.     Seidel further stated on the January 5 call that an investor whose name he could not recall had loaned the Firm $1 million with the intent to convert the loan into a capital infusion, but asked for the money to be repaid after preforming due diligence on the Firm.

52.     After the January 5 call, Seidel submitted a written account of the transaction to the OCIE staff.  The written account acknowledged that he had initially inaccurately described the transaction as a capital infusion rather than a loan.  Seidel falsely claimed in the letter that he was first made aware of the withdrawal of the $1 million on the evening of December 30, 2016.  Seidel lied about his knowledge of the withdrawal to conceal the fact that he continued to operate the Firm knowing that it was not in compliance with net-capital requirements.

## FIRST CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 15(c)(3) of the Exchange Act And Rule 15c3-1 Thereunder

### (All Defendants)

53.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-52.

54.     Defendants knowingly, or at least recklessly, aided and abetted Seidel LLC's continued operation as a broker-dealer without maintaining the minimum required net capital.

55.     By virtue of the foregoing, Defendants violated, and unless restrained and enjoined, will continue violating, Section 15(c)(3) of the Exchange Act and Rule 15c3-1 thereunder.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 17(a)(1) of the Exchange Act And Rule 17a-3(a)(2) Thereunder

### (Mekawy)

56. The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1-52.

57. Defendant Mekawy knowingly, or at least recklessly, aided and abetted Seidel LLC's failure to maintain a ledger (or other record) reflecting all assets and liabilities, income and expense, and capital accounts.

58. By virtue of the foregoing, Mekawy violated, and unless restrained and enjoined, will continue violating, Section 17(a)(1) of the Exchange Act and Rule 17a-3(a)(2) thereunder.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests a Final Judgment:

### I.

Permanently enjoining Defendants, their respective agents, servants, employees, and attorneys, and all persons in active concert or participation with them, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 15(c)(3) of the Exchange Act and Rule 15c3-1 thereunder;

### II.

Permanently enjoining Mekawy, his respective agents, servants, employees, and attorneys, and all persons in active concert or participation with him, who receive actual notice of the injunction by personal service or otherwise, and each of them, from future violations of Section 17(a)(1) of the Exchange Act and Rule 17a-3(a)(2) thereunder;

**III.**

Ordering Defendants to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

**IV.**

Granting such other and further relief as the Court may deem just and proper.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands that this case be tried to a jury.

Dated: New York, New York
       December 23, 2019

By:   s/ Marc P. Berger
        Marc P. Berger
        Lara S. Mehraban
        Sheldon L. Pollock
        Dugan Bliss
        Philip A. Fortino
        *Attorneys for Plaintiff*
        U.S. Securities and Exchange Commission
        New York Regional Office
        200 Vesey Street, Suite 400
        New York, New York 10281-1022
        (212) 336-1014 (Fortino)